# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL CASE NO. |
| v. | 3:13-cr-00010-TCB-RGV |
| FRED WAYNE DENNIS | |

## FINAL REPORT, RECOMMENDATION, AND
## ORDER ON DEFENDANT'S PRETRIAL MOTIONS

Defendant Fred Wayne Dennis ("defendant"), is charged in a three-count indictment with knowingly distributing and receiving child pornography by computer, in violation of 18 U.S.C. §§ 2252(a)(2) and (b), and with knowingly possessing computers and external hard drives containing child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). [Doc. 1].[1] Pending before the Court are defendant's motions to suppress evidence and statements, [Docs. 15, 16, 17, 18, & 24], which the government opposes, [Doc. 25]. Following an evidentiary hearing,[2]

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 34] for a transcript of the evidentiary hearing held on December 4, 2013. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the parties submitted exhibits which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for defendant's exhibits.

the parties filed post-hearing briefs, [Docs. 35, 39, & 44],[3] and the pending motions are ready for ruling.   For the following reasons, it is **RECOMMENDED** that defendant's motions, [Docs. 15, 16, 17, 18, & 24], be **DENIED**.

## I. STATEMENT OF FACTS

In May of 2011, the Department of Homeland Security, Homeland Security Investigations, Immigration and Customs Enforcement ("HSI/ICE"), initiated a peer-to-peer file-sharing investigation in order to identify individuals in the Atlanta area involved in the distribution of child pornography via the Internet.   (Def. Ex. 1

---

[3] On March 21, 2014, defendant filed a surreply to the government's response, see [Doc. 45]; however, "[n]either the Federal Rules nor the Court's Local Rules allow sur-reply briefs as a matter of right, and the Court normally does not permit sur-replies."   USMoney Source, Inc . v. Am. Int'l Specialty Lines Ins. Co., No. 1:07-cv-0682-WSD, 2008 WL 160709, at *2 n.5 (N.D. Ga. Jan. 15, 2008), rev'd on other grounds, 288 F. App'x 558 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); see also Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 857 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted); United States v. Dooley, Criminal File No. 1:11–CR–255–3–TWT, 2013 WL 2548969, at *4 n.6 (N.D. Ga. June 10, 2013), adopted at *3.   "Although the Court may in its discretion permit the filing of a surreply, this discretion should be exercised in favor of allowing a surreply only where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief."   Fedrick v. Mercedes-Benz USA, LLC, 366 F. Supp. 2d 1190, 1197 (N.D. Ga. 2005 ) (citations omitted); see also St. James Entm't LLC v. Dash Crofts, Civil Action No. 1:09-CV-1975-RWS, 2010 WL 2802616, at *1 (N.D. Ga. July 13, 2010) ("Certainly, the Court is disinclined to consider arguments raised in a surreply which could have been raised in an earlier filing.").   Defendant did not seek leave prior to filing his surreply, and he has not identified any valid reason for filing the surreply as the argument presented simply clarifies one of his previously asserted arguments, see [Doc. 39 at 17-23; Doc. 45].   Accordingly, the Court will not consider the surreply in ruling on the pending motions.

(Application & Affidavit for Search Warrant), ¶ 7).[4]  On May 20, 2011, HSI Special

Agent Anthony Scott ("Agent Scott"), made a query of the Child Protection System

("CPS")[5] to obtain a list of IP addresses in Georgia that had offered to distribute

known or suspected child pornography within the last 30 days.  (Id. ¶ 13).  Agent

Scott identified IP address 24.98.20.224, located in Fayetteville, Georgia, and later

---

[4] Peer-to-peer file-sharing is a "method of communication available to Internet users through the use of special software," whereby computers are "linked together through the Internet" and "form a network that allows for the sharing of digital files between users on the network."  (Def. Ex. 1, ¶ 7).  After a user obtains peer-to-peer software, he or she may set up files on a computer to be shared with others running a compatible software program and the user then "obtains files by opening the [peer-to-peer] software on the user's computer, and conducting searches for files that are currently being shared on another user's computer."  (Id.).  A peer-to-peer file transfer is "assisted by reference to an Internet Protocol (IP) address," which is "unique to a particular computer during an online session."  (Id. ¶ 9).

[5] The CPS is a computer software program that assists in the regionalization and tracking of IP addresses.  (Def. Ex. 1, ¶ 10(h)).  The "CPS analyzes the hash values assigned to files available for download . . . and compares them to files stored in government databases that contain known child pornography."  United States v. Dodson, 960 F. Supp. 2d 689, 692 (W.D. Tex. 2013).  "Because each hash value is essentially one of a kind, it assures law enforcement officials there is a high likelihood that child pornography is contained on a computer using the identified [IP] address."  Id.  The CPS identifies and logs "huge quantities of worldwide IP addresses that are identified as participating in the possession and distribution of child pornography."  (Id.).

identified as associated with defendant and his wife,[6] as making available such files. (Id. ¶¶ 14, 21-22).

On the same day, Agent Scott utilized ShareazaLE[7] to make a direct, single-source connection between the undercover ICE computer and defendant's computer associated with IP address 24.98.20.224. (Id. ¶¶ 15-16). During the connection, defendant's computer located at 24.98.20.224 transmitted a list of files it had available for public download, which consisted of 548 files "that had been previously identified as containing known or suspected child pornography." (Id. ¶ 16). Thereafter, between May 21, 2011, and May 27, 2011, defendant's computer shared with the undercover ICE computer nine incomplete digital movie files that were publicly available. (Id. ¶ 17). On May 26, 2011, Agent Harris examined the partially downloaded movie files and found them to contain child pornography.

---

[6] In May of 2011, ICE Special Agent Thomas Harris ("Agent Harris"), obtained an HSI Summons for the production of subscriber information for the IP address 24.98.20.224, (Def. Ex. 1, ¶ 21), and in June of 2011, Comcast replied and identified defendant and his wife as the subscribers with the address of 200 Carrollwood Drive, Fayetteville, Georgia, 30215, (id. ¶¶ 22-25).

[7] ShareazaLE is a "modified version of the free downloadable 'Shareaza' [] client software" for law enforcement to use to "only download files from a single source– the target IP," whereas the public version will "download from many sources." (Def. Ex. 1, ¶ 11). ShareazaLE will "log all activity and transactions that occur while connected to the target IP" and it "adheres to the common [] protocols and functions exactly the same way as the free public version" in that it "has no additional browsing or downloading capabilities over and above the free public version." (Id. ¶¶ 11-12).

(Id. ¶ 18); see also (id. ¶ 19).  The CPS last observed defendant's computer sharing these files on June 16, 2011.  (Id. ¶ 20).

On August 31, 2011, Special Agent Jeffrey White ("Agent White"), with the HSI/ICE Albany, Georgia office, was conducting an online Internet investigation to identify individuals possessing and sharing child pornography using the Gnutella network.[8]  (Id. ¶ 26).  Agent White utilized peer-to-peer Undercover Investigative Software ("UIS"), which "allows downloads only from one source at a time" and "provides the ability to identify potential subjects based on their geographic location" as well as capturing activity that occurs over peer-to-peer networks.  (Id.).  At approximately 10:03 a.m., Agent White, using UIS, initiated a "'direct connect' request to the host computer at IP number 24.99.36.225."  (Id.).  In response, the host computer sent Agent White a list of files currently on the host computer that were publicly available to other users on the network for download.  (Id.).  Of the 760 files on the host computer, Agent White determined that 166 files contained file names with terms such as "pthc, pedoland, Lolita, kiddie, child porn and illegal," which were known to him to be consistent with child pornography.  (Id.).  Agent White

---

[8] The Gnutella network "can be accessed by computers running many different [peer-to-peer] programs such as Limewire, Shareaza, Bearshare, and Frostwire[.]"  (Id. ¶ 10(a)).  During the installation of a Gnutella client, a "[s]hared [f]older" is created and "made available to other Gnutella users to download," and the Gnutella software "allows the user to search for pictures, movies and other files by entering descriptive text as search terms."  (Id. ¶¶ 10(c), 10(g)).

then initiated downloads from the host computer, and two files reviewed by him contained child pornography. (<u>Id.</u> ¶ 27). Agent White attempted to download three additional files, but the connection with the host computer was terminated before the download could be completed. (<u>Id.</u> ¶ 28).[9]

On September 6, 2011, Agent White initiated another "direct connect" request with the same host computer at IP address 24.99.36.225. (<u>Id.</u> ¶ 29). In response, the host computer sent him a list of files currently available to others for download, and of the 961 files, approximately 162 had file names containing terms consistent with child pornography. (<u>Id.</u>). Agent White successfully downloaded three files, all of which were found to depict child pornography. (<u>Id.</u> ¶ 30).[10]

Based on this investigation and the activity from May, August, and September of 2011, Agent Harris applied for and obtained a search warrant for 200 Carrollwood Drive, Fayetteville, Georgia, 30215 on October 6, 2011. (Tr. at 30, 32; Def. Ex. 1). On

---

[9] Although the download was unsuccessful, the file names were known to Agent White from previous investigations and were believed to contain child pornography based on his experience and training. (Def. Ex. 1, ¶ 28).

[10] On the following day, Agent Harris served a summons to Comcast, requesting current subscriber information for IP address 24.99.36.225. (Def. Ex. 1, ¶ 31). On September 19, 2011, Comcast replied that the IP address was associated with defendant and his wife located at 200 Carrollwood Drive, Fayetteville, Georgia, 30215. (<u>Id.</u> ¶ 32).

October 12, 2011, at approximately 6:00 a.m., a team of HSI/ICE special agents[11]

arrived at defendant's home, knocked on the door, and after defendant answered,

they pulled him aside[12] so they could gain entry into the residence and execute the

search warrant.  (Tr. at 9-11, 40-41, 45, 64).  Approximately ten minutes after the

agents entered the residence,[13] Agent Harris made contact with defendant in the

living room in order to interview him.  (Tr. at 12-13).

Prior to interviewing defendant, Agent Harris introduced himself and Agent

Scott and told defendant that they would like to speak with him and asked him if

---

[11] Agent Harris testified that the team was comprised of six to eight agents within his group and possibly four to six more from other groups.  (Tr. at 9, 31).

[12] When asked whether they physically restrained defendant, Agent Harris testified that they "would have put [their] arms on his arms and held him so that he would not interfere with [the] agents going into the house" and that it was possible that someone placed defendant on the floor and in handcuffs, though he did not recall that taking place.  (Tr. at 11, 45).  Defendant testified that when he opened the door, an officer came in, put him on the floor, handcuffed him, and then picked him up and sat him on the couch in the living room.  (Tr. at 64).

[13] Although Agent Harris testified that he recalled entering the residence at about 6:00 a.m. and encountered defendant for the purpose of speaking with him about ten minutes later, see (Tr. at 10, 12, 43), the investigative report notes that the agents entered the home around 6:30 a.m. and that defendant was interviewed at 7:45 a.m., and Agent Harris attributed the discrepancy to a "typo," (Tr. at 43-46, 59-60).  In addition, an e-mail from Agent Harris to the prosecutor in this case notes that defendant was Mirandized at 6:50 a.m., (Tr. at 58-60), and upon questioning by defense counsel about the e-mail, Agent Harris testified that he would "defer to [his] notes as more accurate," (Tr. at 59).

that would be "all right," and defendant responded, "Yes."  (Tr. at 14).[14]  Agent

Harris, in the presence of Agent Scott, then advised defendant of his <u>Miranda</u>[15]

rights, which defendant stated that he understood.[16]   (Tr. at 13-15, 49, 55).

Specifically, Agent Harris advised defendant that he had the right to remain silent

and that any statements he made could be used against him in court.  (Tr. at 17, 54;

Gov. Ex. 3).  He further advised defendant that he had the right to speak to an

attorney, to have one present during the questioning, to have one appointed for him

if he could not afford one, and, in the event he proceeded with questioning without

an attorney, to stop answering questions at any time.  (Tr. at 17, 54; Gov. Ex. 3).

Defendant then agreed to speak with Agent Harris,[17] and he proceeded to make

_____

[14] Agent Harris testified that he did not recall defendant being restrained at this time and that he never saw him in handcuffs or had any reason to believe that he was restrained.  (Tr. at 12-13).  Additionally, defendant was never told he was under arrest.  (Tr. at 13).

[15] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[16] Although defendant's wife was present in the home, she was not in the room while defendant was interviewed.  (Tr. at 14).  Agent Harris testified that he and Agent Scott were seated in separate chairs while defendant was seated on the couch by himself during the interview.  (<u>Id.</u>).  The agents were dressed in "identifiable attire meaning shirts that identified [them] as ICE and/or HSI agents." (Tr. at 15).  The agents were armed, but their firearms remained holstered at all times.  (<u>Id.</u>).  Defendant testified that he did not recall whether he was advised of his <u>Miranda</u> rights, but he did not deny that it happened.  (Tr. at 64).

[17] In particular, Agent Harris asked defendant whether he understood each of the rights that he had explained to him and whether he wished to speak to him,

certain incriminating statements.[18]  (Tr. at 16; Gov. Exs. 1-3).  During the course of the interview, the tone was conversational and defendant appeared to understand the questions asked of him and provided responsive answers, never declined to answer a question asked of him, never asked for an attorney, and did not appear to be under the influence of alcohol or drugs.  (Tr. at 20, 66; Gov. Exs. 1-2).  Agent Harris never made physical contact with defendant and never threatened him or made him any promises, and defendant testified that the agents were courteous to him during the interview.  (Tr. at 21, 66-67).[19]  In fact, the agents asked defendant whether he felt threatened or intimidated during the interview, and he responded that he was intimidated a little bit by the agents coming into his house, but that he

_____

and after defendant replied affirmatively, Agent Harris noted "yes" beside each question on the pre-printed <u>Miranda</u> form.  (Tr. at 16-17, 55; Gov. Ex. 3).  The interview was recorded in full, though the tape recorder was not activated until after the administration of <u>Miranda</u> warnings.  (Tr. at 15-16, 18-20, 49, 55-56; Gov. Exs. 1 & 2).  Agent Harris also handled the warning and recording process in an identical manner with defendant's wife.  (Tr. at 18, 24-26; Gov. Ex. 4).

[18] Agent Scott specifically asked defendant about his use of peer-to-peer software, including whether he recalled a prompt indicating that his files on the BearShare peer-to-peer network would be shared, and defendant responded, "Yeah. All I know is I put no there."  (Tr. at 38-39; Gov. Ex. 2 at p. 10).  However, Agent Harris also testified that he had no personal knowledge about whether defendant had in fact opted out of sharing the files at issue.  (Tr. at 61).

[19] Additionally, defendant told Agent Harris that he had worked for over 20 years as a probation officer for the state of Georgia and had a graduate degree in public administration.  (Tr. at 21, 65).

was not intimidated by the interview. (Tr. at 22-23, 66; Gov. Ex. 2 at pp. 24-25). The interview lasted approximately 35 minutes, (Tr. at 20, 23; Gov. Ex. 1), and defendant was not placed under arrest at that time, (Tr. at 23, 57).

## II. ANALYSIS

Defendant seeks to suppress evidence and his statements because he contends they were the product of an illegal search of files located on his computer within the confines of his home. See generally [Docs. 24 & 39]. Specifically, defendant argues that he had a reasonable expectation of privacy in the files located on his computer and that he did not consent to the entry into and search of his computer files. [Doc. 24 at 7-23; Doc. 39 at 14-16]. Defendant also argues that the entry into his computer equipment and the downloading of files located on his computers were physical trespasses into his home and computers. [Doc. 24 at 15-18]. He further contends that the search of his IP address was akin to a suspicionless roadblock traffic stop, [Doc. 39 at 17-23], and that the CPS's system of logging massive amounts of online user data violates the Fourth Amendment, [Doc. 39 at 24-32]. Defendant asserts that the evidence seized and statements made should be suppressed as the fruits of the illegal search. Finally, defendant also seeks to suppress his statements because he contends that he was not properly advised of his Miranda rights, nor did he agree to waive them. [Id. at 32-35].

The government argues that defendant's placement of his electronic files on a peer-to-peer file-sharing program negates any reasonable expectation of privacy he had in those files and that in accessing those files, the agents did not physically intrude in any protected area.  [Doc. 25 at 7-13; Doc. 44 at 9-12].  The government also argues that consent to search the electronic files is not a factor since defendant did not have an expectation of privacy in those files, [Doc. 44 at 2-3, 10, 12], and that defendant's comparison of the CPS system to suspicionless roadblocks is misplaced, [id. at 12-16].  Moreover, the government asserts that defendant's argument that the CPS's logging of defendant's IP address along with other IP addresses is unconstitutional is without merit.  [Id. at 16-20].  Finally, the government contends that defendant was advised of his Miranda rights and made incriminating statements after  knowingly and voluntarily waiving his rights.  [Doc. 35].

## A.  *The initial search of defendant's computer files*

Defendant may show that a Fourth Amendment violation occurred either by showing that his reasonable expectations of privacy were violated, or that the "[g]overnment physically occupied private property for the purpose of obtaining information[.]"  Dooley, 2013 WL 2548969, at *8 (first alteration in original) (internal citations and marks omitted).  Defendant first argues that the initial search of the files on his computers was illegal because "[g]overnment actors breached [his]

11

reasonable expectation of privacy in his computers and his home[.]" [Doc. 24 at 6]; see also [id. at 7-15].   Defendant also argues that his "Fourth Amendment protections against an actual trespass upon his personal effects were [] violated because when the federal agents electronically invaded the hard drive of his computers without a warrant, they were secured within his home, the most protected area within the meaning of the Fourth Amendment." [Id. at 17]; see also [id. at 6, 15-16, 18].

### 1.    **Reasonable Expectation of Privacy**

"The Fourth Amendment protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion." United States v. Suarez-Blanca, Criminal Indictment No. 1:07-CR-0023-MHS/AJB, 2008 WL 4200156, at *5 (N.D. Ga. Apr. 21, 2008) (citing Katz v. United States, 389 U.S. 347, 353 (1967)). "Fourth Amendment rights are personal, and only individuals who actually enjoy the reasonable expectation of privacy may challenge the validity of a government search." United States v. Bushay, 859 F. Supp. 2d 1335, 1361 (N.D. Ga. 2012), adopted at 1355 (citation omitted) (citing Rakas v. Illinois, 439 U.S. 128, 133-34 (1978)).

Additionally, "'[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or

personal property law or to understandings that are recognized and permitted by society.'" Suarez-Blanca, 2008 WL 4200156, at *5 (alteration in original) (quoting Rakas, 439 U.S. at 143 n.12).  That is, a defendant may challenge a search on Fourth Amendment grounds if "'(1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable.'" Bushay, 859 F. Supp. 2d at 1361 (quoting United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008) (per curiam)).  "Thus, an individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]'" Suarez-Blanca, 2008 WL 4200156, at *6 (alteration in original) (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)).  Consequently, defendant "must establish both a subjective and an objective expectation of privacy,"[20] and he "bears the burden of showing a legitimate expectation of privacy in the area searched."  Id. (citations omitted).

Defendant first asserts that he had a reasonable expectation of privacy in his computers and the contents of his computers' hard drives that were located securely in his home.  [Doc. 24 at 7-11].  However, the agents accessed only his publicly

---

[20] "The subjective prong is a factual inquiry, and requires that a person exhibit an actual expectation of privacy," while the "objective prong is a question of law, and requires that the privacy expectation be one that society is prepared to recognize as reasonable."  Bushay, 859 F. Supp. 2d at 1362 (citations and internal marks omitted); see also United States v. Durdley, 436 F. App'x 966, 968 (11th Cir. 2011) (per curiam) (unpublished).

shared files on his computers via defendant's peer-to-peer file-sharing program from a remote location, and therefore, the issue is whether defendant's installation and use of this peer-to-peer program negated any expectation of privacy in those shared files that he may otherwise have had. Defendant attempts to meet the subjective prong of the reasonable expectation test by asserting that he exhibited an actual expectation of privacy by trying to opt out of the sharing feature of his peer-to-peer BearShare program. See [id. at 13-14]. Specifically, defendant testified at the evidentiary hearing that when prompted on his computer that his files on BearShare would be shared, he clicked "no," see (Tr. at 38-39; Gov. Ex. 2 at p. 10), and he therefore asserts that "[b]y exercising this option, [he] showed his intention to refuse public access to the files located in his computers" even though his "efforts failed due to an apparent defect in the BearShare program," [Doc. 24 at 14]. Based on defendant's limited testimony that he intended to and attempted to opt out of the sharing feature of the BearShare program, the Court will assume for purposes of his motions that he has satisfied the subjective prong of the test. However, for the following reasons, the Court finds that defendant has failed to satisfy the objective prong that the "privacy expectation be one that society is prepared to recognize as reasonable." Bushay, 859 F. Supp. 2d at 1362 (citations and internal marks omitted).

14

The Eleventh Circuit has held that a defendant's utilization of a peer-to-peer file-sharing program that allows other public users of such software to access the shared files on that defendant's computer negates any reasonable expectation of privacy in those shared files.  See United States v. Norman, 448 F. App'x 895, 897 (11th Cir. 2011) (per curiam) (unpublished).  In addition, other "circuits that have taken up this question uniformly hold that there is no reasonable expectation of privacy in files the government obtained using peer-to-peer sharing services like LimeWire [and BearShare]." United States v. Conner, 521 F. App'x 493, 498 (6th Cir. 2013) (unpublished) (citing United States v. Stults, 575 F.3d 834, 843 (8th Cir. 2009); United States v. Ganoe, 538 F.3d 1117, 1127 (9th Cir. 2008); United States v. Perrine, 518 F.3d 1196, 1205 (10th Cir. 2008)); see also United States v. Thomas, Nos. 5:12–cr–37, 5:12–cr–44, 5:12–cr–97, 2013 WL 6000484, at *19 (D. Vt. Nov. 8, 2013) ("The federal courts of appeals that have examined the privacy implications of searching peer-to-peer networks for files potentially containing child pornography have concluded that a search of publicly available information does not violate a computer user's reasonable expectation of privacy.").

This is true even in situations where a defendant may not have knowingly enabled the sharing feature, or even where he affirmatively attempted to opt out. See United States v. Borowy, 595 F.3d 1045, 1048 (9th Cir. 2010) (per curiam). Similar

to defendant's argument here, the defendant in <u>Borowy</u> argued that his case was distinguishable from the line of cases finding no reasonable expectation of privacy in electronic files obtained by the government where a defendant utilizes a peer-to-peer file-sharing program by pointing to his "ineffectual effort to prevent LimeWire from sharing his files." <u>Id.</u> In particular, "[t]he crux of [Borowy's] argument [was] that he simply did not know that others would be able to access files stored on his own computer and that, although [he] intended to render the files private, his technical savvy failed him." <u>Id.</u> (first and second alterations in original) (citation and internal marks omitted). The <u>Borowy</u> court noted that despite Borowy's efforts, his files "were still entirely exposed to public view; anyone with access to LimeWire could download and view his files without hindrance." <u>Id.</u> The Ninth Circuit then concluded that "Borowy's subjective intention not to share his files did not create an objectively reasonable expectation of privacy in the face of such widespread public access." <u>Id.</u> (citations omitted).[21]

---

[21] Defendant's reliance on <u>United States v. Durham</u>, 618 F.3d 921 (8th Cir. 2010), in support of his argument that he had a reasonable expectation of privacy in his publicly shared files because he did not knowingly expose those files to the public, <u>see</u> [Doc. 24 at 12], is misplaced. In <u>Durham</u>, the Eighth Circuit addressed only whether a distribution enhancement applied based on the defendant's use of a file-sharing program where the defendant had no knowledge regarding the program's capabilities since another individual had installed it on his computer. 618 F.3d at 931. In particular, the defendant in <u>Durham</u> argued that he should not have received a distribution enhancement because there was no evidence that he had intended to distribute or otherwise make child pornography available to others. <u>Id.</u>

Likewise, in the present case, defendant utilized the file-sharing program BearShare, and despite his alleged efforts to prevent the public at large from accessing those files, they were still entirely exposed to the public for downloading and viewing without the need to employ any special means to access them other than using a compatible file-sharing program.   This case is virtually indistinguishable from the facts presented in <u>Borowy</u>, and in analogous circumstances, the Eleventh Circuit has ruled that a defendant did not have a reasonable expectation of privacy in files that were shared on a computer network even though he sought to protect the files on his computer through a security setting.  <u>See</u> <u>United States v. King</u>, 509 F.3d 1338, 1341-42 (11th Cir. 2007) (per curiam) (finding defendant did not have a reasonable expectation of privacy in his computer files on his laptop connected to a military base network from his dorm room that were remotely accessed over a military computer network by a computer specialist even where he sought to protect his files through security settings, never knowingly exposed them to the public, and was unaware that the files were shared

---

at 924-25.  The defendant presented "concrete evidence of ignorance," <u>id.</u> at 926-27, and the Eighth Circuit found that he had presented such evidence and therefore reversed the distribution enhancement, <u>id.</u> at 931-32.  Here, as the government points out, <u>see</u> [Doc. 25 at 10], the issue is not whether defendant had a specific intent to distribute, but whether he had a reasonable expectation of privacy in the publicly shared files on his computer, and his intent is simply irrelevant to the objective prong of this test.

on the network).  Accordingly, the Court finds that the search of the publicly shared electronic files on defendant's computers did not violate defendant's Fourth Amendment rights as he did not have a reasonable expectation of privacy in those files.[22]  See Dodson, 960 F. Supp. 2d at 695; United States v. Hoffman, C[r]iminal No. 13–107 (DSD/FLN), 2013 WL 3974480, at *4 (D. Minn. Aug. 1, 2013), adopted at *2; United States v. Hill, Criminal Action No. 10–05044–01–CR–SW–RED, 2012 WL 2735329, at *2 (W.D. Mo. June 18, 2012), adopted by 2012 WL 2734039, at *1 (W.D. Mo. July 9, 2012); United States v. Sawyer, 786 F. Supp. 2d 1352, 1355-56 (N.D. Ohio 2011).

## 2.   **Physical Trespass**

Relying on United States v. Jones, 132 S. Ct. 945 (2012), defendant argues that the "warrantless intrusion into [his] home and computers [], even if only electronically, constitutes an unreasonable trespass in violation of [his] Fourth

---

[22] Defendant also argues that "[t]here is no evidence in the record proving that [he] voluntarily consented to the government's warrantless intrusion into his computer" and that "if [he] in fact opted out of sharing his files, he did not consent to the government's warrantless search of his computer, as opting out of file-sharing software is a direct manifestation of one's decision not to share their private dealings with the public."  [Doc. 39 at 15-16 (emphasis omitted)].  However, when there is no reasonable expectation of privacy, the Fourth Amendment is not implicated, see Smith v. Maryland, 442 U.S. 735, 740 (1979) (citations omitted), and the Court "need not decide whether any other grounds might have justified the search[,]" United States v. Goldstein, No. 2:10–cr–00525–GMN–PAL, 2012 WL 9172076, at *5 (D. Nev. Oct. 29, 2012), adopted by 2013 WL 5408265, at *5 (D. Nev. Sept. 25, 2013).

Amendment rights." [Doc. 24 at 15-17]. In <u>Jones</u>, the Supreme Court considered whether the warrantless installation of a GPS tracking device on the defendant's vehicle violated his Fourth Amendment rights. 132 S. Ct. at 948. In analyzing this issue, the Court found that the defendant's "Fourth Amendment rights do not rise or fall with the *Katz* formulation." <u>Id.</u> at 950. Rather, the Court found that the defendant's vehicle was an "effect" and that the warrantless physical trespass of that "effect" to obtain information constituted an unreasonable search under the Fourth Amendment. <u>Id.</u> at 948. Thus, the Supreme Court made clear that the Fourth Amendment is implicated where the "[g]overnment physically occupie[s] private property for the purpose of obtaining information." <u>Id.</u> at 949. However, as noted by the government, <u>see</u> [Doc. 25 at 12], the Supreme Court also confirmed that "[s]ituations involving merely the transmission of electronic signals without trespass would remain subject to [the] *Katz* analysis[,]" <u>Jones</u>, 132 S. Ct. at 953 (emphasis omitted). That is, the Supreme Court stated that the "*Katz* reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." <u>Id.</u> at 952 (emphasis omitted).

"Several courts have rejected the application of *Jones* to the investigation of file sharing programs," <u>United States v. Brashear</u>, Criminal No. 4:11–CR–0062, 2013 WL 6065326, at *3 (M.D. Pa. Nov. 18, 2013) (citations omitted), and the Court finds the

reasoning of these cases persuasive.  The government did not use a tracking device, such as at issue in Jones; instead, it merely obtained information publicly available on shared files via a software program that connected with defendant's computer on which defendant had installed a file-sharing program.  Thus, there was no Fourth Amendment violation tied to common law notions of trespass in this case.  Indeed, "the contents of the shared folder on [defendant's] computer were knowable to law enforcement without physical intrusion to [defendant's] house because this information was also available to members of the public."  Norman, 448 F. App'x at 897; see also Russell v. United States, No. 4:11 CV 1104 RWS, 2013 WL 5651358, at *8 (E.D. Mo. Oct. 16, 2013) (internal citation omitted) (noting that defendant was "using a file-sharing program that broadcast the contents of his computer to the internet and invited users to search those contents.  Thus no government trespass into [defendant's] home or effects occurred."); United States v. Nolan, No. 1:11CR 82 CEJ, 2012 WL 1192183, at *11 (E.D. Mo. Mar. 6, 2012), adopted by 2012 WL 1192757, at *2 (E.D. Mo. Apr. 9, 2012) ("When [defendant] placed the images in his shared folder, he was offering them to the world" and his "privacy was not invaded by [the agent] because [defendant] offered them to [the agent] and to anyone else on the world wide network.").  Because "[t]his investigation involve[d] the transmission of electronic signals without trespass," it did not "implicate

[defendant's] Fourth Amendment rights under *Jones*," <u>Brashear</u>, 2013 WL 6065326, at *3 (internal marks omitted), and defendant's argument in this regard is without merit, <u>see</u> <u>United States v. Brooks</u>, No. 12–CR–166 (RRM), 2012 WL 6562947, at *5 (E.D.N.Y. Dec. 17, 2012) (citations omitted) (finding <u>Jones</u> inapplicable where the "agent did not install any device or software on [defendant's] computer to enable monitoring or tracking, did not physically enter [defendant's] home, and did not physically access his computer.").

**B.**   *Defendant's IP address*

    **1.**   <u>**The search of defendant's IP address**</u>

Defendant also argues that the search of his IP address from the list of IP addresses on the CPS was invalid because "rigorous procedural safeguards must be met . . . analogous to the safeguards required when law enforcement decides to stop cars at a police roadblock."   [Doc. 39 at 17-18 (emphasis omitted)]. Specifically, defendant asserts that "[w]hether or not a roadblock is placed due to some exigency or simply randomly for general enforcement purposes, all roadblock procedures share one common constitutional requirement: police cannot be afforded discretion regarding which vehicle to stop.  Either every vehicle encountering the roadblock must be stopped, or, at the very least, a systematic procedure must be in place which stops a sufficiently neutral percentage of cars."   [Doc. 39 at 19-20 (emphasis and

citations omitted)].  Defendant then attempts to apply this theory to the search of his IP address, arguing that the "government routinely identif[ies] and randomly select[s] one individual from the many IP addresses identified when the pool of 'suspected' pornographers was created" and has therefore "admittedly targeted a random IP address for which it had neither a warrant or probable cause to 'detain', in the roadblock context, or search as a matter of law."  [Id. at 20-21 (emphasis omitted)].

Defendant's analogy, however, fails because "obtaining IP addresses is . . . an act that does not implicate the Fourth Amendment at all[.]"  United States v. Rigmaiden, No. CR 08–814–PHX–DGC, 2013 WL 1932800, at *13 (D. Ariz. May 8, 2013) (citation omitted).  That is, "[a]n internet subscriber does not have a reasonable expectation of privacy in his IP address or the information he provides to his Internet Service Provider, such as Comcast, in order to legally establish an internet connection[.]"  United States v. Stanley, Criminal No. 11–272, 2012 WL 5512987, at *12 (W.D. Pa. Nov. 14, 2012); see also Penton v. United States, No. 2:11–CV–429–WKW, 2013 WL 6009537, at *13 (M.D. Ala. Nov. 13, 2013).  "Without a reasonable expectation of privacy, no search within the context of the Fourth Amendment could have occurred."  Dodson, 960 F. Supp. 2d at 695; see also United States v. Christie, 624 F.3d 558, 573-74 (3d Cir. 2010) (footnote omitted) (finding

defendant "had no reasonable expectation of privacy in his IP address and so cannot establish a Fourth Amendment violation").   In contrast, "[a] vehicle stop at a highway checkpoint is a seizure within the meaning of the Fourth Amendment, which requires that searches and seizures be reasonable."  United States v. Rodger, 521 F. App'x 824, 828 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."  United States v. Jacobsen, 466 U.S. 109, 113 (1984) (footnote omitted).  Defendant has failed to offer any explanation as to how he would have a "possessory interest[]" in his IP address.  Id.  Simply put, defendant's analogy, while novel, is not supported by the core concepts of Fourth Amendment jurisprudence.

### 2.   The retention of defendant's IP address on the CPS

Relying on Klayman v. Obama, Civil Action No. 13–0881 (RJL), 2013 WL 6598728 (D.D.C. Dec. 16, 2013), defendant argues that the CPS's logging and retention of IP addresses and associated browsing history, including his, for future use by law enforcement is unconstitutional.  [Doc. 39 at 24-32].  In this regard, defendant frames the issue as "one's reasonable expectation of privacy in the information discovered through the activities of the large numbers of IP addresses that were traced, recorded, and analyzed by the government, not in one's reasonable

expectation of privacy in the government's subsequent acquisition and search of the shared files," and asserts that the "methodology behind the government's CPS program is highly analogous to the unconstitutional [National Security Agency ("NSA")] metadata program."  [Id. at 27 (emphasis omitted)].

In Klayman, the court considered, in the context of injunctive relief, whether the NSA's Bulk Telephony Metadata Program, which included the collection of cell phone metadata, constituted a search under the Fourth Amendment and was therefore unconstitutional.[23]  2013 WL 6598728, at *17-24.  The court first considered whether the government's collection of the telephone metadata without any particularized suspicion of wrongdoing, with the retention of this data lasting five years, and then queries of that data without prior judicial approval, violated the individuals' reasonable expectation of privacy.  Id. at *17.  In analyzing this issue, the court discussed the landmark case of Smith v. Maryland, in which the Supreme Court "held that [a defendant] had no reasonable expectation of privacy in the numbers dialed from his phone because he voluntarily transmitted them to his phone company, and because it is generally known that phone companies keep such information in their business records," 2013 WL 6598728, at *17 (citing Smith, 442

---

[23] The court explained that the surveillance program included "two potential searches: (1) the bulk collection of metadata and (2) the analysis of that data through the NSA's querying process."  Klayman, 2013 WL 6598728, at *15.

U.S. at 742-44), and distinguished Smith, noting that "people in 2013 have an entirely different relationship with phones than they did thirty-four years ago," that the Supreme Court "in 1979 [could not] have ever imagined how the citizens of 2013 would interact with their phones," and that "the surveillance program now before [the court] is so different from a simple pen register[,]" id. at *18-19, 21.  The court therefore found that the government's "metadata collection and analysis almost certainly does violate a reasonable expectation of privacy."  Id. at *19.  The court further explained that the "rapid and monumental shift towards a cell-centric culture means that the metadata from each person's phone reflects a wealth of detail about [his] familial, political, professional, religious, and sexual associations that could not have been gleaned from a data collection in 1979." Id. at *21 (citations and internal marks omitted).  That is, "[r]ecords that once would have revealed a few scattered tiles of information about a person now reveal an entire mosaic — a vibrant and constantly updating picture of the person's life."  Id. (footnote and citation omitted).

Having found that a search occurred, the Court then discussed whether it was reasonable and concluded that it "[could not] imagine a more 'indiscriminate' and 'arbitrary invasion' than this systematic and high-tech collection and retention of personal data on virtually every single citizen for purposes of querying and

analyzing it without prior judicial approval," and that the NSA's "bulk collection program is indeed an unreasonable search under the Fourth Amendment." Id. at 22-24 (footnote omitted). Based on this ruling, defendant asserts that that the "agents' widely and unrestrained use of the [CPS] software similarly constitutes a significant intrusion into an internet user's reasonable expectation of privacy" by generating information "showing the dates and times that a specific [user] was logged on the Gnutella network and the IP address[] used." [Doc. 39 at 26-27, 29 (emphasis and citation omitted)].

Eleven days after the Klayman decision, another court rendered a different ruling on the same issue. See Am. Civil Liberties Union v. Clapper, 959 F. Supp. 2d 724, 749-52 (S.D.N.Y. 2013). In Clapper, the court began with analyzing the decision reached by the Supreme Court in Smith and noted that the "privacy concerns at stake in [that case] were far more individualized" since Smith "involved the investigation of a single crime and the collection of telephone call detail records collected by the telephone company at its central office, examined by the police, and related to the target of their investigation, a person identified previously by law enforcement," yet the Supreme Court still "found there was no legitimate privacy expectation[.]" Id. at 750 (citation omitted). The Clapper court also noted that when the NSA makes a query of the telephony metadata database, "it only learns the

telephony metadata of the telephone numbers within three 'hops' of the 'seed,'" and that "without resort to additional techniques, the [g]overnment does not know who any of the telephone numbers belong to," but all it "sees is that telephone number A called telephone number B" without knowing "who subscribes to telephone numbers A or B." Id. at 750-51.  The court then concluded, after acknowledging the Klayman decision, that because Smith "control[led], the NSA's bulk telephony metadata collection program [did] not violate the Fourth Amendment." Id. at 752.

Defendant's reliance on Klayman is misplaced because the CPS's data collection is clearly distinguishable from the NSA telephony metadata collection at issue in that case, and in any event, the Court finds the reasoning of the Clapper decision persuasive in concluding that there was no Fourth Amenment violation by the CPS's logging of IP addresses that were subsequently queried by the agents. First, the CPS logs only those IP addresses suspected of sharing child pornography, (Def. Ex. 1, ¶¶ 10(h)-(m), 13), not five years of "metadata of hundreds of millions of other citizens without any particularized suspicion of wrongdoing," Klayman, 2013 WL 6598728, at *17.  Indeed, the Klayman court  cited the nature and quantity of information contained in telephony metadata as the most important factor in its analysis, see id. at 20, but the IP addresses collected by the CPS do not contain any personal information, and the government may only obtain subscriber information

upon "resort[ing] to additional techniques." Clapper, 959 F. Supp. 2d at 750. Thus, the CPS's logging of IP addresses suspected of sharing child pornography simply does not approach the mosaic of information that led the Klayman court to conclude that the Fourth Amendment was implicated by the NSA telephony metadata collection. In short, the scope and basis of data collection by the CPS is a far cry from the NSA metadata collection, and as the Clapper court reasoned, even the "collection of breathtaking amounts of information unprotected by the Fourth Amendment does not transform that sweep into a Fourth Amendment search," id. at 752 (citations omitted). Thus, the Court finds that there was no Fourth Amendment violation by the CPS's logging and retention of IP addresses associated with suspected child pornography.[24]

## C. *Defendant's statements*

Defendant made statements to the agents on the day of the execution of the search warrant that he now seeks to suppress, arguing that he was not properly advised of his Miranda rights, and that even if he was, he did not waive his rights.

---

[24] Moreover, "[w]hatever the ultimate outcome of [the] issue [in Klayman and Clapper] in higher courts, whether an individual lacks a privacy interest in dialed numbers because those numbers are necessarily disclosed to his phone company is a much different question than whether an individual loses his privacy interest in an item because he voluntarily makes it publicly available on the internet." United States v. Post, Criminal Action No. 3:13–CR–20, 2014 WL 345992, at *4 (S.D. Tex. Jan. 30, 2014) (footnote omitted). Simply put, this case does not implicate any Fourth Amendment issues. See id.

[Doc. 39 at 32-35].[25]  The parties do not dispute whether defendant was in custody at the time he made these statements.  See [Doc. 35; Doc. 39 at 33].  Thus, the issue presented is whether defendant was properly advised of, and waived, his Miranda rights.

The government bears the burden of proving by a preponderance of evidence that defendant validly waived his Miranda rights.  United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997); see also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).  In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. at 467.  Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow.  Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires."  Id. at 468-

---

[25] Defendant also argues that the evidence seized along with his statements must be suppressed because they were the fruit of the illegal search.  See generally [Docs. 24 & 39].  Having already found that there were no Fourth Amendment violations in relation to downloading the shared files depicting child pornography from defendant's computers, his fruit of the poisonous tree argument fails.

70.  <u>Miranda</u> further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." <u>Id.</u> at 473-74 (footnote omitted).  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." <u>Id.</u> at 474.

A defendant may waive his rights if the waiver is made knowingly, intelligently, and voluntarily. <u>Id.</u> at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

<u>United States v. Patterson</u>, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (<u>quoting United States v. Barbour</u>, 70 F.3d 580, 585 (11th Cir. 1995)); <u>see also</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986); <u>Edwards v. Arizona</u>, 451 U.S. 477, 482 (1981); <u>Fare v. Michael C.</u>, 442 U.S. 707, 725 (1979); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).  "No single factor is necessarily determinative of the issue whether a defendant knowingly and

intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted). However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver. United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002). To find a waiver involuntary, "coercive police activity is a necessary predicate." Connelly, 479 U.S. at 167.

Prior to questioning defendant inside his residence during the execution of the search warrant, Agent Harris, in the presence of Agent Scott, advised him of his Miranda rights by reading the rights from a pre-printed Advice of Rights and Waiver form, which specifically advised him that he had the right to remain silent; that any statements he made could be used against him in court; and that he had the right to speak to an attorney, to have one present during the questioning, to have one appointed for him if he could not afford one, and, in the event he proceeded with questioning without an attorney, to stop answering questions at any time. (Tr. at 13-15, 49, 55; Gov. Ex. 3).[26] Defendant acknowledged that he understood his

---

[26] Although defendant argues that he was not properly advised of his Miranda rights because there was "no actual recording of the process, even though the interview itself was taped," that he did not recall being advised of his rights, and because there are "timeframe discrepancies," see [Doc. 39 at 33], Agent Harris clearly testified that he advised defendant of his rights and then began to record the interview, see (Tr. at 14-18, 49), and nothing in the record contradicts this testimony. While defendant attempts to challenge Agent Harris' testimony by pointing to the omission of the administration of these warnings from the tape recording of the

rights and that with those rights in mind, he wished to waive them and speak with the agents.  (Tr. at 14-17, 54-55; Gov. Ex. 3).  After defendant waived his rights, Agents Harris and Scott proceeded to question him, and defendant then made certain incriminating statements that he now moves to suppress.  (Tr. at 16; Gov. Exs. 1-3).

Defendant contends that he was "only advised of his rights," but that "he did not waive them."  [Doc. 39 at 33 (emphasis omitted)].  In support of this argument, defendant notes that "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."  [Id. at 34 (citation and internal marks omitted)].  However, defendant was not simply silent after being administered his rights, but specifically replied with an affirmative response to Agent Harris' questions of

---

interview, [Doc. 39 at 33], there is no requirement that the advisement of such warnings be recorded, see United States v. Huber, 66 F. App'x 123, 124 (9th Cir. 2003) (unpublished); United States v. Davis, No. 11 CR 62, 2013 WL 1628166, at *8 (N.D. Ill. Apr. 15, 2013).  Additionally, while defendant testified that he did not recall whether he was advised of his rights, he did not deny that it happened, see (Tr. at 64), and therefore, his testimony does not contradict Agent Harris' testimony that he properly advised defendant of his rights prior to questioning him.  Furthermore, while Agent Harris' testimony regarding the time frame of the administration of the warnings was inconsistent with his notes, Agent Harris testified that he would defer to his notes as more accurate, see (Tr. at 59), and his testimony regarding the time frame, which was more than two years after the execution of the search warrant, see (Tr. at 1, 8), in no way contradicts or casts doubt on his testimony that he properly advised defendant of his Miranda rights.

whether he understood each of his rights *and* whether, with those rights in mind, he still wished to speak with him, which Agent Harris noted on the form contemporaneously with defendant's answers.  (Tr. at 16-17, 55; Gov. Ex. 3).  Thus, defendant's argument in this regard is not supported by the record.

The totality of the circumstances here indicate that defendant, who was a retired probation officer with a graduate degree in public administration, see (Tr. at 21, 65), voluntarily, knowingly, and intelligently waived his rights and agreed to speak with the agents.  Defendant was read his <u>Miranda</u> rights and was advised of his right to remain silent and to have counsel present, and warned that anything he said could be used against him in court.  (Tr. at 13-15, 49, 55; Gov. Ex. 3).  Defendant then orally waived those rights and proceeded to make incriminating statements. (Tr. at 16-17, 55; Gov. Ex. 3).  There is no evidence that the agents physically or verbally threatened defendant or made him any promises, and in fact, defendant testified, and the tape recording confirms, that the agents were courteous to him during the interview.  (Tr. at 20-23, 66-67; Gov. Exs. 1-2).  Defendant did not ask for clarification, stop the interview, request the presence of counsel, or otherwise indicate in any way that he did not understand his rights or the consequences of his waiver.  (Tr. at 20, 66; Gov. Exs. 1-2).[27]  Though the agents were armed, their firearms

_____

[27] Although defendant contends that he "never told agents that he did not want an attorney" and that Agent Harris "never asked [him] whether he wished to

remained holstered at all times, (Tr. at 15), and defendant was not arrested at the conclusion of the interview on that day, (Tr. at 23, 57).   On these facts, the government has shown that, under the totality of the circumstances, defendant was advised of his rights, was aware of the nature of his rights being abandoned and the consequences of his decision to abandon them, and that he knowingly and intelligently waived his <u>Miranda</u> rights.   Thus, it is **RECOMMENDED** that defendant's motion to suppress statements, [Doc. 15], be **DENIED**.

---

speak with an attorney," "whether he wanted an attorney present during questioning," or "whether he could afford a lawyer," [Doc. 39 at 34-35], Agent Harris credibly testified that he advised defendant of all of his rights, <u>see</u> (Gov. Ex. 3), which was all he was required to do, and "[t]o invoke the right to counsel, a suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney,'" <u>United States v. Turner</u>, No. CR 07-00604 MMM, 2008 WL 4820997, at *9 (C.D. Cal. Oct. 27, 2008) (citations and internal marks omitted); <u>see also</u> <u>Davis v. United States</u>, 512 U.S. 452, 459-62 (1994).   Thus, "[i]nvocation of the <u>Miranda</u> right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney,'" <u>Davis</u>, 512 U.S. at 459 (quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991)), which simply is not present here.   That is, "[a] defendant who wants an attorney reasonably can be expected to take the simple expedient of saying so directly to a custodial officer.   If he does not take that step, he has not made the <u>unequivocal</u> request for counsel that <u>Davis</u> requires, and <u>Davis</u> dictates that the officers have no obligation to refrain from questioning him." <u>Martin v. Evans</u>, No. ED CV 04-0210 PSG (FMO), 2008 WL 724720, at *22 (C.D. Cal. Mar. 12, 2008). Therefore, "'[u]nless the suspect actually requests an attorney, questioning may continue.'" <u>United States v. Meador</u>, No. 1:06 CR 134 CDP DDN, 2008 WL 4922001, at *16 (E.D. Mo. Jan. 7, 2008) (quoting <u>Davis</u>, 512 U.S. at 462).

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that defendant's motions to suppress evidence and statements, [Docs. 15, 16, 17, 18, & 24], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 7th day of April, 2014.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE